**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT SUNDIN, AMANDA KNAPP-ELLIS** ) | | |
| **and ROBERT SORIANO, on behalf of** ) | | |
| **themselves and a class,** ) | | |
| ) | | |
| **Plaintiffs,** ) | **13-CV-1560** | |
| ) | | |
| **vs.** ) | | |
| ) | **Magistrate Judge Sidney I.** | |
| ) | **Schenkier** | |
| **STELLAR RECOVERY, INC.,** ) | | |
| ) | | |
| **Defendant.** ) | | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF FINAL APPROVAL
OF CLASS ACTION SETTLEMENT AGREEMENT**

Plaintiffs ROBERT SUNDIN, AMANDA KNAPP-ELLIS, and ROBERT SORIANO

(collectively "Plaintiffs"), respectfully submit this memorandum in support of final approval of

their settlement for injunctive relief under Rule 23(b)(2) with Stellar Recovery, Inc. ("Stellar").

This Court granted preliminary approval to the parties' settlement agreement ("Agreement") on

April 25, 2016 (Dkt No. 89)[1].

Plaintiffs and Defendant Stellar have reached a proposed class action settlement in this case

involving claims under the Telephone Consumer Protection Act, 47 U.S.C. §227(b) ("TCPA") and

the Illinois Consumer Fraud Act, 815 ILCS 505/2 ("ICFA").

The settlement provides injunctive relief to the Class, consisting of four

components: (1) changes to the way in which Stellar obtains and memorializes the receipt of

---

[1] An Amended Preliminary Approval Order was entered on April 27, 2016 incorporating
the Court's handwritten changes to the April 25, 2016 Order and correcting a
typographical error as to the time of the Final Approval Hearing. (Dkt. No. 91) There
were no substantive differences between the two orders.

consent from consumers to receive auto-dialed calls on their cell phones; (2) changes to the way in which Stellar responds to, and memorializes, revocation requests; (3) changes in Stellar's policies and procedures for training staff with respect to the requirements of the TCPA; and (4) a two-year reporting period in which Stellar is to certify compliance with the injunction on a bi-annual basis. Stellar has determined that the cost to implement these components exceeds one million dollars.

For these reasons and those that follow, Plaintiffs individually and on behalf of themselves and all others similarly situated, by Class Counsel, respectfully request that this Court grant final approval of the Agreement and enter the Final Approval Order, attached hereto as <u>Appendix 1.</u>

## I.  <u>OVERVIEW OF THE CASE</u>

This consolidated Telephone Consumer Protection Act ("TCPA") class action against Stellar grows out of two cases transferred and consolidated to this Court on or about April 15, 2016 (Dkt. No. 87).

Specifically, Defendant is a privately held nationally licensed third party collection company, headquartered in Florida. Consolidated Complaint ¶¶ 10-11. Through its calling centers in Jacksonville, Florida and Kalispell, Montana, Stellar contacts consumers throughout the United States in order to collect upon delinquent debts owed to various creditor grantors and financial institutions. *Id.* Plaintiffs allege that telephone calls were made to each of them, using an automatic telephone dialing system or an artificial or pre-recorded voice, without their prior express consent as prohibited by the TCPA. *Id.* ¶¶ 15-33. Plaintiffs allege that Stellar has a pattern and practice of obtaining debtors' phone numbers through skip tracing, without scrubbing the telephone numbers to determine which belong cellular telephone numbers. *Id.* ¶ 34. Plaintiffs

also allege that Stellar fails to cease calling cellular telephones after persons called have revoked consent. *Id.*

Plaintiff Sundin initiated this class action lawsuit (the "Illinois Action") against Stellar on February 28, 2013 after he received an unwanted, unauthorized, prerecorded call from Stellar on his cellular telephone. Dkt. No. 1; *see also* Declaration of Cassandra P. Miller ("Miller Decl.") ¶ 2 (Appendix 2).

Eight months later, Plaintiff Knapp-Ellis brought a separate class action lawsuit against Stellar in the Western District of Washington. *See Amanda Knapp-Ellis, et al. v. Stellar Recovery, Inc.*, United States District Court for the Western District of Washington, Case No. 2:13-CV-01967-RSM (the "Washington Action"), Dkt. No. 1. Plaintiff Knapp-Ellis alleges she received at least ten phone calls on her cellular telephone from Stellar in 2013. Consolidated Complaint ¶ 23. All of the calls consisted of a pre-recorded message for purposes of collecting an allegedly owed debt. *Id.* Like Plaintiff Sundin, Plaintiff Knapp-Ellis never gave Stellar consent to call her cellular phone. *Id.* ¶ 25. Although Plaintiff Knapp-Ellis requested that Stellar stop calling her, Stellar continued to place automatic calls with pre-recorded messages to Knapp-Ellis' cellular telephone. *Id.* ¶¶ 29-29.

Six months later, Plaintiff Knapp-Ellis successfully moved to amend her complaint to add Plaintiff Soriano, who received approximately three to six prerecorded calls between approximately January 2014 and March 2014. *See* Washington Action, Dkt. No. 18; Consolidated Complaint ¶ 30. Like the other Plaintiffs, Mr. Soriano did not provide prior express consent to receive prerecorded phone calls from or on behalf of Defendant on his cellular telephone. Consolidated Complaint ¶ 32.

Prior to formal consolidation of the Illinois and Washington Actions, the Plaintiffs worked together to take both fact and class-related discovery. Miller Decl. ¶ 3. All Parties issued and answered written discovery. *Id*. The Plaintiffs took the depositions of the President of Stellar, the Chief Compliance Officer of Stellar, and the Dialer Manager of Stellar. *Id*. Additionally, the Plaintiffs took the deposition of the Executive Vice President of Operations and Chief Financial Officer of LiveVox, the dialing system Stellar currently uses. *Id*. Stellar also took the deposition of Plaintiff Sundin.

Plaintiffs also retained an expert to analyze Stellar's call data. Miller Decl. ¶ 4. Plaintiffs' expert determined that over just six months, Stellar placed approximately 162 million calls. *Id*. Of those calls, 73 million were made to cellular telephones, 5 million of which were unique cellular telephone numbers. *Id*. Based on these figures, the parties estimate Stellar calls approximately 10 million unique cellular telephone numbers each year, which translates to 45 million unique cellular telephone numbers during the entire class period. *Id*.

After Plaintiffs analyzed the call data, the Parties requested a settlement conference with the Court that would include Plaintiffs in the Washington Action. Miller Decl. ¶ 5. On May 14, 2015, the Parties participated in a settlement conference before this Court. *Id*. Unable to reach an agreement, the Parties participated in another phone conference before this Court in June, 2015 and scheduled a second settlement conference for August 12, 2015. *Id*. ¶¶ 5-6. As part of those discussions, Plaintiffs reviewed Stellar's financial information and insurance policies. *Id*. ¶ 5. Based on this review, Plaintiffs determined that Stellar had insufficient finances to provide financial relief to proposed class members, even under a very narrow class definition. *Id*. Finally, Stellar's insurance company denied any coverage for the claims. *See* May 6, 2015, Denial of Coverage Letter (Appendix 3).

Despite the stark reality of Stellar's finances, with the Court's help, the Parties explored other ways to provide relief to class members during the settlement conferences. Miller Decl. ¶ 6. Although Stellar's finances made it impossible to provide monetary relief to class members, the Parties and the Court determined that class members would benefit from injunctive relief that required Stellar to make significant changes to its autodialing practices. *Id.* In August 2015, prior to the second scheduled conference with this Court, the Parties reached an agreement in principle. Miller Decl. ¶ 7. Since then, counsel for Plaintiffs have worked rigorously with Stellar to reach a compliance plan that will provide appropriate relief to class members. *Id.* ¶ 8. At all times the Parties' settlement negotiations were highly adversarial, non-collusive and at arm's-length. *Id.*

Now, after years of litigation, including extensive discovery, and a settlement conference over which this Court presided, Plaintiffs and Stellar have entered into a Settlement Agreement. The terms of the Settlement Agreement, which require substantial injunctive relief, provide for a fair, reasonable, and adequate resolution of the claims of Plaintiffs and the Settlement Class in light of the large number of class members, Stellar's limited financial resources, and the lack of insurance coverage.

Finally, the settlement and its injunctive relief are necessary in order to stop repeated harm. Since Plaintiff Sundin brought his claim three years ago, Stellar has faced ten or more new lawsuits under the TCPA, some of which allege violations as late as 2015. *See, e.g., Diggs v. Stellar Recovery, Inc.*, Case No. 1:15-cv-01260-PLM-PJG (W.D. Mich.); *Little v. Stellar Recovery Inc.*, Case No. 2:15-cv-14184-SFC-MJH (E.D. Mich.); *Gray v. Stellar Recovery, Inc.*, Case No. 1:15-cv-03819-ODE-JCF (N.D. Ga.); *Mere v. Stellar Recovery, Inc.*, Case No. 1:15-cv-24049-FAM (S.D. Fla.); *Moise v. Stellar Recovery, Inc.*, Case No. 3:15-cv-01204-TJC-MCR (M.D. Fla.); *Weiler v. Stellar Recovery, Inc.*, Case No. 3:15-cv-01199-MMH-JBT (E.D. Mich.); *Sainvil v. Stellar Recovery, Inc.*, Case No. 3:15-cv-01193-BJD-JRK (M.D. Fla.); *Aceves v. Stellar Recovery, Inc.*, Case No. 3:15-cv-00278 (S.D. Tex.); *Evans v. Stellar Recovery, Inc.*, Case No. 1:15-cv-08664 (N.D. Ill.); *Laplume v. Stellar Recovery, Inc.*, Case No. 2:15-cv-00516-NT (D. Me.); *Davenport v. Stellar Recovery, Inc.*, Case No. 3:15-cv-01483-HES-JRK (M.D. Fla.).

## II.    THE ADMINISTRATION OF THE SETTLEMENT

### A.    The Preliminary Approval Order.

This Court's Preliminary Approval Order found that the proposed terms of the settlement satisfied all of the elements of Federal Rule of Civil Procedure 23(a) and 23(b)(2) and preliminarily certified a class defined as:

> *(a) all persons with United States cellular numbers, (b) who on or after February 28, 2009 (c) received automated calls from Defendant (d) where Defendant did not have prior express consent to make the automated calls (for example, where the number was obtained through skip tracing or captured by Defendant's equipment from an inbound call, or Defendant called the number after consent had been revoked).*

The Order also established a procedural framework for the final approval of the settlement, provided for notice, set deadlines and procedures for Settlement Class Members to submit objections to the Agreement, and set a date and time for the fairness hearing. (Dkt. Nos. 89 and 91)

### B.    The Sending of Class Notice.

Although Rule 23(b)(2) does not require notice to be sent to class members, Class Counsel caused extensive notice of the settlement to be given in order to advise class members of their rights. Notice of this settlement has been specifically and methodically disseminated to persons and parties that were most likely to *know* or have access to the class members. Class Counsel worked with Stellar's counsel to establish an extensive list of attorneys and groups around the country that would be most likely to know these potential class members. These proposed groups are listed in the attached Appendix 4.

Between May 24 and May 26, 2016, the notice of settlement attached as Exhibit A to Appendix 5, which was approved by this Court on April 25, 2016, was sent by e-mail 106 legal aid societies around the country. (Declaration of Benjamin Hutnick, ¶ 7, Appendix 5.)  Notice was

sent by facsimile and/or US Mail to any legal aid society for which counsel was unable to find a working email address. *Id.* Notice was also provided to the Department of Justice and the Attorneys General of each of the fifty states.

Notice was further promulgated via Class Counsel's website at www.edcombs.com/class-action-notices/, a copy of the notice is attached hereto as Appendix 6. The Class Settlement Agreement and Amended Preliminary Approval Order were also made available via Class Counsel's website.

As of the July19, 2016 deadline, no objection to the parties' proposed settlement was filed by any class member.

## III. THE VALUE OF THE SETTLEMENT TO THE CLASS IS SIGNIFICANT

### A. The Injunction Provides Significant Relief

The Settlement Agreement provides injunctive relief to the Settlement Class that requires Stellar to stop practices that were previously part of its business model. The injunctive relief consists of four components: changes to the way in which Stellar obtains and memorializes the receipt of consent from consumers to receive auto-dialed calls on their cell phones; changes to the way in which Stellar responds to, and memorializes, revocation requests; changes in Stellar's policies and procedures for training staff with respect to the requirements of the TCPA; and a two-year reporting period in which Stellar is to certify compliance with the injunction on a bi-annual basis. Settlement Agreement, § D.

Specifically:

(a) Stellar shall notate consent in its written account documentation if and when said consent is obtained, and if and when consent is revoked;

(b) Stellar shall strictly and routinely search and scrub every number

provided to it by the original creditor to determine if it is a cellular telephone number. If the results of a scrub indicate that a number is assigned to a cellular telephone, Stellar shall notate that said number is assigned to a cellular telephone in the written account documentation for the corresponding account.

(c) If Stellar obtains any new telephone numbers for debtors from any source (relatives, public resources, skip tracing, etc.), then those numbers must be scrubbed utilizing reasonable procedures to determine which phone numbers are cellular telephone numbers.

(d) For each number identified as a cellular telephone number or for which Stellar does or may know to be a cellular telephone number, said number cannot be called utilizing Stellar's auto-dialer unless Stellar has written documentation of prior express consent as contemplated by the TCPA.

(e) For each cellular telephone number wherein Stellar does not have concrete evidence of consent, Stellar must use human intervention to dial the number until and unless Stellar is able to obtain prior express consent.

(f) Prior express consent must be clear and must be formally in writing or verifiable by recorded telephone call via the debtor in question.

(g) Prior express consent must be clearly and conspicuously noted in the computer system utilized by Stellar. Stellar must also clearly and conspicuously note the revocation of consent in its computer system.

(h) Stellar agrees to submit copies of any putative individual or class action lawsuits filed against it and asserting a claim pursuant to the TCPA during the reporting period to Class Counsel beginning 6 months from the date that this agreement is signed and every

6 months thereafter until expiration of the injunction. Reports from Stellar are due on September 28, 2016, March 28, 2017, September 28, 2017 and March 28, 2018.

(i) Finally, Stellar must incorporate into its employee handbooks sufficient training regarding the TCPA. Stellar must devote classes and training for new and current debt collection employees as well as supervisory staff concerning: the TCPA, the meaning and how to obtain prior express consent as defined by the TCPA, the effect and statutory damages permitted under the TCPA, and prudent procedures for use and application of phone numbers obtained by debt collection employees during normal collection efforts. Stellar shall create a new TCPA compliance manager (who may be a current employee of Stellar and the new compliance manager position need not be dedicated exclusively to that position) who shall review the training information, work to train staff, and oversee debt collection practices and their TCPA compliance or lack thereof.

Settlement Agreement § D.

### B. The Cost of the Injunctive Relief to Stellar is Significant

The foregoing injunctive relief requires Stellar to make significant changes to its business practices, some of which Stellar made during the pendency of this lawsuit. Stellar estimates that the changes it has already made have reduced Stellar's production by 25 to 30 percent, at a cost of between $250,000 and $750,000. Declaration of Garrett Schanck in Support of Preliminary Approval of Class Action Settlement ("Schanck Decl.") ¶ 6 (Appendix 7). Stellar estimates that the total implementation cost moving forward, including past, present, and future costs associated with the injunctive relief, will be $1,000,000.00, at a minimum. *Id.*

Specifically, Stellar estimates the training it will provide to new and current employees will cost $15,000 annually. *Id.* ¶ 5(a). Stellar hired a specialized vendor, Interactive Data, Inc.

("IDI"), to scrub all telephone numbers Stellar receives from any source, on a daily basis, at a cost of $1,200.00 per month in order to identify those telephone numbers which are assigned to cellular telephones. *Id.* ¶ 5(b).

Now, immediately upon identifying a telephone number as assigned to a cellular telephone, Stellar makes a notation within its Latitude collection software, triggering firm software restrictions that prevent the telephone number from being dialed by an automated system unless Stellar first obtains express permission to do so from the individual to whom the telephone number is assigned. *Id.* ¶ 5(c). Stellar has agreed to follow the same procedure regarding cellular telephones for which persons have revoked consent. *Id.* ¶ 5(f).

For all accounts, Stellar has agreed to store written account information and recorded telephone calls for at least four years, at a cost of $15,000 per month, and up to $27,000 per month. *Id.* ¶ 5(f), (g). Stellar has agreed to use the recordings to perform improved ongoing quality assurance and compliance evaluations of its employees, and to ensure that the employees comply with Stellar's stricter approach to TCPA compliance, and specifically regarding consent or revocation thereof. *Id.* ¶ 5(h). Moreover, Stellar now routinely and randomly screens recorded calls to ensure that its employees are adhering to its stricter TCPA compliance measures, and quality assurance training representatives review recorded calls with Stellar employees during individual one-on-one counseling sessions in order to address any TCPA compliance failures. *Id.*

Stellar has also agreed to increased Quality Assurance ("QA") implementation measures, including reviewing calls daily via live monitoring and recorded call playback, with training and counseling performed on the spot with each agent when areas for improvement are identified. *Id.* Stellar will conduct two or more written assessments of its collectors per month. *Id.* While

the Parties were negotiating the terms of the injunctive relief in September 2015, Stellar hired an additional QA employee whose primary responsibility is to monitor and review calls, at an annual cost of $45,000.00.  *Id.*  Finally, beginning in May 2016, Stellar's QA department shall also hold monthly compliance meetings with all collectors, at which selected calls will be played and discussed in a group setting for further training and development.  *Id.*

### C.  The Agreement Provides for Notice

An additional benefit of the settlement, although not required by Rule 23(b)(2), is notice. Since direct notice is impracticable, notice was sent by electronic mail, facsimile and/or US Mail to legal aid societies and the attorneys general of all fifty states.  Hutnick Declaration ¶5-7.  Class Counsel believes that this form of notice is more effective than, say, a notice published in USA Today, a form of notice which is typical in many class action settlements when direct notice is impracticable.  *Id.*  Stellar paid for all costs of notice.  Settlement Agreement ¶ 2.5.

### D.  Class Members Do Not Release Any Claims Against Stellar

Last, but certainly not least, Class members have been notified of their right to bring individual TCPA actions against Stellar and to collect all actual and statutory damages to which they would be entitled in the absence of this Settlement. Although the injunctive relief is a significant benefit to all Class members because it serves to reduce further violations of the TCPA, the fact that each Class member's right to recover individual damages remains unextinguished is truly significant. The combined relief of the injunction and retention of their right to sue makes this a highly unusual but valuable settlement for each and every Class member. Settlement Agreement ¶ 2.6.

### E.  Lead Plaintiffs' Incentive Awards Are Reasonable.

Pursuant to this Court's recommendation at the April 15, 2016 Preliminary Approval Hearing, Plaintiff Sundin will receive an award of $4,000 and Plaintiffs Knapp-Ellis and Soriano will each received $2,000 for their damages and for their participation and roles as class representatives. Each Plaintiff participated in extensive discovery and settlement discussions. Plaintiff Sundin prepared and sat for a deposition. Plaintiff Knapp-Ellis alleges she received at least ten phone calls on her cellular telephone from Stellar in 2013. Plaintiff Soriano alleges receipt of three to six prerecorded calls between approximately January 2014 and March 2014. Additionally, unlike the class members, each Plaintiff has agreed to provide Defendant a complete release of all claims, including monetary damages. The amount sought by lead Plaintiffs is reasonable in light of the number of wrongful calls received by each Lead Plaintiff.

## III. THE COURT SHOULD GRANT FINAL APPROVAL TO THE SETTLEMENT

Final approval is warranted because the Agreement is fair, reasonable, and adequate.

### A. The Proposed Settlement Provides Substantial Relief to the Settlement Class Particularly in Light of the Uncertainty of Prevailing on the Merits

While no one fairness factor is to be given dispositive weight, courts have consistently stated that the relative strength of the plaintiff's case on the merits as compared to what the defendant offers by way of settlement is the most important consideration. *See Isby,* 75 F.3d at 1199; *Armstrong,* 616 F.2d at 322. Nevertheless, "[b]ecause the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (citations omitted).

#### 1. Class Counsel Have Secured Valuable Relief for the Class Regarding Stellar's Business Practices

The Settlement Agreement, which requires Stellar to change its business practices, provides significant value to the Settlement Class Members. Prior to this litigation, Stellar had a

pattern and practice of calling cell phones obtained via skip tracing or otherwise captured by Stellar's dialer in violation of the TCPA. Likewise, Stellar had a pattern and practice of disregarding requests that Stellar stop calling cell phones. The benefit the Settlement Agreement provides to Settlement Class Members is an injunction against further violations of the TCPA. During the two-year period in which the injunction is in effect, Stellar will implement policies and procedures geared toward ensuring that consent is obtained from consumers before any numbers are placed in Stellar's dialer. These policies and procedures include increased training, changes to the software and hardware utilized by Stellar, and detailed reporting under penalty of perjury.

The injunctive relief obtained for the Class comports with the purpose of the TCPA — to protect consumers from unwanted and harassing calls. *See Mims v. Arrow Fin. Servs., LLC,* 132 S.Ct. 740, 745 (2012). Moreover, the relief is consistent with the injunctive relief approved in *Grant v. Capital Mgmt. Servs., L.P.*, No. 10-cv-2471-WQH (BGS), 2014 WL 888665 (S.D. Cal. Mar. 5, 2014), a TCPA case involving similar facts. There, the district court approved a Rule 23(b)(2) settlement that required the defendant to abide by injunctive terms that are nearly identical to those here. *Id.* at *2. Specifically, the defendant was required to adopt identifying and blocking technology it did not previously employ to ensure it did not make unlawful calls, and to provide declarations under perjury every six months confirming compliance with the injunction. *Id.*

Finally, the changes to Stellar's business practices are valuable to the Settlement Class because they come with a steep price tag that Stellar alone must pay. Stellar estimates the total cost of implementing the injunctive relief as $1,000,000.00, at a minimum. Schanck Decl. ¶ 6. Specifically, Stellar estimates the training it will provide to new and current employees will cost $15,000 annually. *Id.* ¶ 5(a). Stellar hired a specialized vendor, IDI, to scrub all telephone numbers Stellar receives from any source, on a daily basis, at a cost of $1,200.00 per month in order to identify those telephone numbers which are assigned to cellular telephones. *Id.* ¶ 5(b). Stellar has agreed to store written account information and recorded telephone calls for at least four years, at a cost of $15,000 per month, and up to $27,000 per month. *Id.* ¶ 5(f), (g). Finally, Stellar hired an additional QA employee whose primary responsibility is to monitor and review

calls, at an annual cost of $45,000.00. *Id.*

## 2. A Rule 23(b)(3) Settlement Was Not Practicable

Although Class Counsel initially sought to settle the class claims pursuant to Rule 23(b)(3), they concluded after receipt of formal and informal discovery that a Rule 23(b)(3) settlement was not practicable. Plaintiffs' counsel identified 5 million unique cellular telephone numbers that Stellar called during a six-month period alone, with no corresponding evidence of consent. Miller Decl. ¶ 4. Therefore, the number of class members during the entire class period may be up to ***45 million***. *Id.* The TCPA provides for statutory damages of $500 per call. At these numbers, Stellar would face a judgment in the billions. Stellar's financials show that it does not have the financial ability to fund a Rule 23(b)(3) settlement in the one million dollar range, let alone the billion-dollar range. Miller Decl. ¶ 5. Moreover, Stellar's insurance company denied any coverage for the claims. *Id.* For the same reasons, Stellar does not have the financial resources to send either direct or publication notice to the Settlement Class.

Finally, it is not possible to determine from Stellar's records the identity of all the Settlement Class Members. Stellar may have made unauthorized calls to up to 45 million cellular telephones since 2009 (the year the class period began). Miller Decl. ¶ 4. Because some of those cell phone numbers were "skip-traced," it is possible that many of those numbers did not belong to the actual debtor, but rather a friend or relative, making identification of all Settlement Class Members impossible.

For all these reasons, a Rule 23(b)(3) settlement was impracticable.

## 3. The Strength of Plaintiffs' Case

Plaintiffs continue to believe that their claims against Stellar have merit and they would make a compelling case if their claims were tried. Nevertheless, Plaintiffs and the Settlement Class would face a number of difficult challenges if the litigation were to continue.

First, Stellar denies it lacked consent to contact Plaintiffs or class members, and has consistently argued that class certification is not appropriate because the individualized question of whether a customer consented will predominate at trial. "Courts are split on whether the issue

of individualized consent renders a TCPA class uncertifiable on predominance and ascertainability grounds, with the outcome depending on the specific facts of each case." *Chapman v. First Index, Inc.*, No. 09 C 5555, 2014 WL 840565, at *2 (N.D. Ill. March 4, 2014) (citing cases).  For example, in *Savanna Group, Inc. v. Trynex, Inc.*, No. 10-cv-7995, 2013 WL 66181, at *3 (N.D. Ill. Jan. 4, 2013), the court granted class certification and rejected the defendant's argument that questions of consent caused individual issues to predominate, noting that the defendant had not offered evidence tending to show that any particular class member consented to the faxes at issue.  On the other hand, in *G.M. Sign, Inc. v. Brinks Mfg. Co.*, No. 09 C 5528, 2011 WL 248511, at *8 (N.D. Ill. Jan. 25, 2011), the court declined to certify a class, finding that the defendant offered evidence illustrating that consent could not be shown with common proof.  If Stellar were able to present convincing facts to support its position, there is a risk that the Court would decline to certify the class, leaving only the named Plaintiffs to pursue their individual claims.

Second, Stellar produced financials to Plaintiffs that show Stellar has insufficient financial resources to pay class members even a dollar per class member toward a judgment estimated at more than one billion dollars from a verdict for the millions of calls Stellar made to cell phones during the class period.  Miller Decl. ¶ 5.  Moreover, Stellar has threatened to enter bankruptcy in the face of judgment.  Terrell Decl. ¶ 21.  With a potential judgment in the billions, it is likely that Stellar's threat would become a reality.

Finally, there is a risk of losing a jury trial.  And, even if Plaintiffs did prevail at trial, any judgment could be reversed on appeal (or subject to bankruptcy).  By contrast, the settlement provides substantial and meaningful relief to Settlement Class Members without delay, particularly in light of the above risks that Settlement Class Members would face in litigation.

### B.      Continued Litigation Is Likely to Be Complex, Lengthy, and Expensive

Litigation would be lengthy and expensive if this action were to proceed.  Although the Parties have commenced formal discovery, extensive motion work, including Plaintiffs' motion for class certification, remains.  Rather than a subset of call data, Plaintiffs would need to engage their expert to analyze the full *terabyte* (or, a trillion bytes) of call data that Stellar produced.

Stellar would likely need to do the same. Realistically, it could be at least a year before the case would proceed to trial. Even if Plaintiffs obtained a judgment, Stellar would likely appeal, which would further delay any relief to class members. The settlement avoids these risks and provides immediate and certain relief. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) (citation omitted) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.").

### C. The Settlement Resulted from Extensive, Arm's-Length Negotiations and Is Not the Result of Collusion

The requirement that a settlement be fair is designed to prevent collusion among the Parties. *Mars Steel Corp. v. Cont'l Ill. Nat'l. Bank & Trust Co. of Chicago*, 834 F. 2d 677, 684 (7th Cir. 1987) (approving settlement upon a finding of no "hanky-panky" in negotiations). There is an initial presumption that a proposed settlement is fair and reasonable when it was the result of arms-length negotiations. Newberg § 11:42; *see also Am. Int'l Grp.*, 2012 WL 651727, at *10.

Here, the proposed settlement was negotiated after years of litigation, followed by several months of highly contested settlement negotiations, including multiple settlement conferences. Counsel for the Parties are particularly experienced in the litigation, certification, trial, and settlement of nationwide class action cases. Appendix 8, Terrell Decl. ¶¶ 2-14; *see also Appendix 10*. In negotiating this settlement, Class Counsel had the benefit of years of experience with class actions in general and a familiarity with the facts of this case in particular. *Id*. Moreover, the Parties benefitted from the Court's active participation throughout the negotiation process. The fact that Plaintiffs achieved an excellent result for the Settlement Class despite facing significant hurdles is a testament to the non-collusive nature of the proposed settlement.

### D. The Stage of the Proceedings and the Amount of Discovery Completed Supports Preliminary Approval

Plaintiffs' counsel have thoroughly analyzed the factual and legal issues involved in this case. Miller Decl. ¶ 3; Terrell Decl. ¶ 15. Plaintiffs' counsel served and responded to written discovery, diligently reviewed the information that Stellar produced, and had multiple discovery

conferences with Stellar to insist upon complete discovery responses, including complete information regarding the calls. *Id.*

Plaintiffs took the depositions of the President of Stellar, the Chief Compliance Officer of Stellar and the Dialer Manager of Stellar. *Id.* Additionally, Plaintiffs took the deposition of the Executive Vice President of Operations and Chief Financial Officer of LiveVox, the dialing system Stellar uses. Miller Decl. ¶ 3. In addition, Plaintiffs served subpoenas for documents on third parties, Comcast, LiveVox, and DialConnection, LLC. Terrell Decl. ¶ 16.

Plaintiffs also retained an expert to analyze part of Stellar's call data. Miller Decl. ¶ 4. Plaintiffs' expert determined that over just six months, Stellar placed approximately 162 million calls. *Id.* Of those calls, 73 million were made to cellular telephones, 5 million of which were unique cellular telephone numbers. *Id.* Based on these figures, Plaintiffs estimate Stellar calls approximately 10 million unique cellular telephone numbers each year, which translates to 45 million unique cellular telephone numbers during the entire class period. *Id.*

Although work remained, including additional extensive, expensive expert analysis, which would be required for class certification, Plaintiffs' counsel were well-informed about the strengths and weaknesses of their case at the time they reached settlement in this case. Terrell Decl. ¶¶ 19, 21. Thus, this factor favors settlement.

### E. The Proposed Class Notice Satisfies Due Process

Rule 23(e)(1) requires the Court to "direct notice in a reasonable manner to all class members who would be bound by" a proposed settlement. Fed. R. Civ. P. 23(e)(1); *see also* Manual for Complex Litig. at § 21.312. The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

"As a general matter, less precision is required of class definitions under Rule 23(b)(2) than under Rule 23(b)(3), where mandatory notice is required by due process." *Multi–Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 630 (C.D. Cal. 2007); *see also*

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (holding that notice of right to opt-out of suit for money damages is required by the Due Process Clause); *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972) (stating that in contrast to certification of a subdivision (b)(3) class, "notice to the members of a(b)(2) class is not required and the actual membership of the class need not therefore be precisely delimited."). Manageability is not as important a concern for injunctive classes as for damages classes. *See Elliott v. Weinberger*, 564 F.2d 1219, 1229 (9th Cir. 1977) ("by its terms, Rule 23 makes manageability an issue important only in determining the propriety of certifying an action as a(b)(3), not a(b)(2), class action."), *aff'd in pertinent part sub nom. Califano v. Yamasaki*, 442 U.S. 682, 701 (1979).

Although notice is generally not required as part of a Rule 23(b)(2) settlement, the Parties have nonetheless agreed to a notice program that constitutes the best notice practicable under the circumstances, provides due and sufficient notice to the Settlement Class, and fully satisfies the requirements of due process and Federal Rule of Civil Procedure 23. Settlement Agreement ¶ 2.7. The notice contemplated by the Settlement Agreement is superior to the traditional publication notice in a national newspaper such as USA Today. Miller Decl. ¶ 9. Many Class members, including persons with limited financial resources, are unlikely to read national newspapers such as USA Today. *Id.* Class Counsel have attempted to devise a notice which is more likely to reach a greater number of persons likely to be Class members, sent via electronic mail to legal aid and social service organizations whose clients may be of limited means. *Id.* Finally, the proposed notice is short and easily duplicated and disseminated, in order to provide persons in the Settlement Class with enough information to evaluate whether to participate in the settlement. Settlement Agreement, Ex. A.

## IV.    THE ATTORNEY'S FEES AND COSTS ARE REASONABLE

The Settlement Agreement provides for the payment of $105,000.00 to Class Counsel. This amount is reasonable in light of protracted nature of the litigation, the heavily litigated individual

class cases, *and* in light of Class Counsel's collective lodestar, which exceeds $375,000.00.

### A. Class Counsel's Fee Request Is Reasonable

In determining the reasonableness of attorneys' fees, courts "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988). "The object in awarding a reasonable attorney's fee … is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). Generally speaking, the "ratio that is relevant … is the ratio of (1) the fee to (2) the fee plus what the class members received." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (2014) (quoting *Redman v. RadioShack Corp.*, 768 F.3d 662, 630 (7th Cir. 2014)). Although there is no hard-and-fast rule, the Seventh Circuit has opined that in consumer class actions, attorneys' fees awarded to class counsel "should not exceed a third or at most a half of the total." *Redman*, 768 F.3d at 631.

Plaintiffs' request for an award of attorneys' fees in the amount of $105,000 is appropriate because the Settlement puts an end to a persistent injury to persons who never consented to being called on their cellular telephones, or who revoked previous consent to be called. At the low-end, the settlement's value is $385,000 ($250,000 existing cost of injunctive relief + $30,000 class representative awards + $105,000 attorneys' fees). At the high-end, the settlement's value is $1,135,000 ($1,000,000 existing and future cost of injunctive relief + $30,000 class representative awards + $105,000 attorneys' fees). At the low-end, Plaintiffs' request for fees constitutes 27% of the total settlement value. At the high-end, Plaintiffs' request for fees constitutes 9% of the total settlement value. Both percentages are well within the acceptable range of fee awards in the Seventh Circuit.

For similar reasons, the current settlement overcomes the deficiencies found by the Court in *Grok Lines, Inc. v. Paschall Truck Lines, Inc.*, No. 14 C 08033, 2015 WL 5544504 (N.D. Ill. Sept. 18, 2015) (Chang, J.). There, the court found that the settlement in a junk fax blasting case was unfair and unreasonable to the class because (1) the injunctive relief was of no value to the

class because the conduct at issue involved "an isolated fax" blast, which was based on "the single purchase of a single list of fax numbers," and the defendant "had no plans to repeat" the fax advertisements, and (2) based on the size of the class, the amount awarded in attorneys' fees could have provided substantial relief to the class members. *Id.* at *3-7.

In contrast, here, Stellar is a debt collector who relies heavily on its auto dialers as part of its business model in contacting and obtaining payments from alleged debtors. Through discovery, Plaintiffs learned that during a four-year period, Stellar called approximately 10 million unique cellular telephone numbers each year, which translates to 45 million unique cellular telephone numbers during the entire class period. Miller Decl. ¶ 3. Stellar's use of its autodialing equipment was not a "one-time marketing experiment," as was the case in *Grok-Lines*, but rather, is "part of [Stellar's] established or planned" business strategy. *Grok Lines, Inc.*, at *4. Prior to the filing of the present Lawsuit, Stellar had very few, if any, procedures in place for (1) training employees on the TCPA and its compliance (2) scrubbing for cell phone numbers (3) tracking and monitoring of consent or retraction of consent from debtors or (4) screening and reporting of compliance as it relates to the TCPA. Schanck Decl., ¶¶ 3-5. Therefore, the injunctive relief provided by the terms of the current agreement "modify, or stop altogether, practices and strategies that [are] part and parcel of a continuing business model." *Id.*

Furthermore, and contrary to the facts of the *Grok Lines* case where the class consisted of only 180 individuals, here, based on the call log data confirmed by Plaintiffs' expert, the class consists of 45 million unique class members. In *Grok Lines*, a portion of the $100,000 requested in attorney fees, could have provided a reasonable award to the class members for damages. Here, however, where Stellar's net worth is limited and there is no insurance coverage, awarding attorneys' fees to the class members would require the class members to provide a release of their claims for damages in exchange for a miniscule fraction of a penny.

By contrast, the proposed Settlement allows the Settlement Class Members to retain their claims for damages, while imposing real restrictions on Stellar's business practices and use of its dialing equipment, providing real relief to those who are subject to present and future harm by

Stellar's current practices. *Grok Lines, Inc.*, at *4.

B. **Class Counsel's Lodestar Exceeds the Amount Requested:**

As set forth in the Declarations of Daniel A. Edelman (Appendix 9) and Beth E. Terrell (Appendix 10), Class Counsel includes experienced class action attorneys, all of whom contributed their skills and expended their resources in a coordinated effort that resulted in the settlement of this matter.

In computing the lodestar, the hourly billing rate applied is the hourly rate that is normally charged in the community where counsel practices, i.e., the "market price." *See, e.g., Blum v. Stenson*, 465 U.S. 886, 895 (1984); *McDonald v. Armontrout*, 860 F.2d 1456, 1459 (8th Cir. 1988) ("'in most cases, billing rates reflect market rates – they provide an efficient and fair short-cut for determining the market rate'"); *Spencer v. Comserv Corp.*, 1986 WL 15155, Fed.Sec.L.Rep. ¶93, 124, at 95, 532 (D. Minn. Dec. 30, 1986) ("compensating a nationally recognized securities class action attorney at his hourly rate is entirely appropriate."); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3rd Cir. 1973) ("The value of an attorney's time generally is reflected in his normal billing rate."). The hourly rates of Plaintiffs' counsel and a detailed listing of Class Counsel's lodestar are set forth in Appendices 8 and 9 and its Exhibits.

The actual lodestar and expenses incurred by Edelman, Combs, Latturner and Goodwin, LLC, Terrell Marshall Law Group PLLC, Law Office of SaraEllen Hutchison PLLC, Law Office of Thomas G. Jarrard, and Robert W. Mitchell, Attorney at Law as of October 7, 2016 was $354,582 (fees) and $21,658.67 (costs), for a total of $376,240.67 (*See* Exhibit F to the Declaration of Daniel A. Edelman, attached as Appendix 9 and Exhibit 1 to the Declaration of Beth E. Terrell, attached as Appendix 10). This amount, already in excess of the agreed upon maximum recovery, does not include time spent preparing for, and appearing at, the fairness hearing plus the continuing calls from class members, inquiring about the settlement checks. Accordingly, the request for $105,000.00 is fair and reasonable, and Plaintiffs request that the Court approve that amount.

## V.     <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiffs, individually and on behalf of themselves and all others similarly situated, by Class Counsel, respectfully request that this Court grant final approval of the Agreement and enter the Final Approval Order, attached hereto as <u>Appendix 1.</u>

Respectfully submitted,

<u>s/Cassandra P. Miller</u>
Daniel A. Edelman
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER
  & GOODWIN, L.L.C.
20 S. Clark St, Suite 1500
Chicago, Illinois  60603

<u>s/ Beth E. Terrell, *Pro Hac Vice Pending*</u>
Beth E. Terrell, *Pro Hac Vice Pending*
TERRELL MARSHALL LAW GROUP PLLC
936 N. 34th Street, Suite 300
Seattle, Washington 98103

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 7th day of October, 2016, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


<u>s/Cassandra P. Miller</u>
Cassandra P. Miller